Walter H. WOLF, Kenneth H. Cleeland, William J. Graham, Carl L. Myers, Jr., William H. Wright and Thomas H. Malone t/a Villa VI, a partnership, Plaintiffs,

v.

William CROSBY and Lois H. Crosby, his wife, Defendants.

Court of Chancery of Delaware, Sussex.

Submitted March 7, 1977.

Decided June 30, 1977.

John E. Messick of Tunnell & Raysor, Georgetown, for plaintiffs.

William Swain Lee of Betts & Lee, Georgetown, for defendants.

MARVEL, Chancellor:

Plaintiffs in this action for an order directing specific performance of a contract for the sale of real estate are members of a partnership doing business under the name of Villa VI, having on January 15, 1973 entered into a contract for the purchase of a house and lot situate in a development

known as Country Club Estates near Rehoboth Beach from John T. and Colleen S. Reager. On the same date, plaintiffs entered into a separate agreement to purchase a lot adjacent to the Reager lot from the defendants William and Lois H. Crosby for the sum of $16,500. The agreement with the defendants provided for final settlement to be completed on or before May 1, 1973 and made completion of the contract in issue " * * * contingent on purchasers obtaining 90% financing for a period of 20 years at not more than 8% interest * * * "

Plaintiffs subsequently sought to obtain other financing for the purchase of both properties as a single unit from several lenders and ultimately received a commitment from Second National Building and Loan, Inc. for such an arrangement. However, on the same date, namely, April 10, 1973, Mrs. Mary W. Henderson, the real estate agent, who had acted as an intermediary between the plaintiffs and defendants, learned of the existence of certain liens on the adjoining property which plaintiffs had contracted to purchase from the Reagers. Mrs. Henderson then informed the defendant William Crosby, pursuant to instructions from one of the plaintiffs, that an extension of time was necessary " * * for financial reasons * * * ". Mr. Crosby expressed a willingness to grant such an extension and informed Mrs. Henderson that there was no necessity that the extension be in writing. The duration of the extension, however, was not clearly defined.

In late April and again in late May, 1973, Mr. Eberly, attorney for the plaintiffs, conferred with Mr. Crosby concerning the real estate transactions in question. The latter expressed no objection when informed that there were several liens on the Reager property which might present problems.

On May 24th, a meeting of the Villa VI partnership members was held in order to inspect and execute all the documents necessary for the contemplated transaction, and on May 25th Mr. Crosby picked up a settlement sheet from Mr. Eberly's office which outlined prospective disbursements and expenses in connection with the forthcoming transaction. On the same day Mr. Eberly sent all necessary documents to Second National Building and Loan, Inc. for final approval.

On June 5, 1973, however, Mr. Crosby informed Mrs. Henderson by letter that the property was no longer for sale. Mrs. Henderson responded by letter dated June 9 to the effect that all preparations had been made and that settlement was to be completed as soon as the necessary papers were received from the lender and funds required to complete the transaction were made available to the plaintiffs' attorney, Mr. Eberly. On June 15, Mr. Crosby caused Mr. Eberly to be informed by letter that the former deemed the contract of sale here in issue to be unenforceable.

Plaintiffs nonetheless went on to purchase the house and lot, which adjoined the defendants' unimproved lot, in early July after having obtained a loan from the Farmers Bank. Plaintiffs approached Mr. Crosby again on July 4, 1973 through Mrs. Henderson, but were unsuccessful in persuading him to sell the unimproved lot, and this action for specific performance was filed on July 17, 1973.

Defendants make four basic contentions in opposition to plaintiffs' application for an order directing specific performance of the contract in issue. They first assert that plaintiffs breached the original contract of sale in which time was in effect of the essence in that settlement did not take place on May 1, 1973 as was contemplated by the agreement. And while the agreement did not expressly provide that time was of the essence, defendants contend that certain other of its terms had the effect of imposing such a requirement, reliance being placed upon the opinion of this Court in *Kittinger v. Rossman*, 12 Del.Ch. 276, 112 A. 388, 390 (1921).

The Court in the cited case found that time was of the essence in a contract for the sale of real estate even though the agreement did not contain an express provision to that effect. While the opinion considered a number of factors, the decision

appears to be largely predicated upon the fact that the agreement in question fixed a precise time for the delivery of possession and also contained a clause which provided that:

"In case the title is found to be imperfect the forfeit money paid will be refunded and contract cancelled."

The Court further stated that:

"This means that the buyer need not wait for the seller to clear his title, at least he need not wait beyond the time when the conveyance of a good title is due him. For the above reasons it was clear that the parties deemed it vitally important that the contract be performed at the stipulated times and that made time the essence of the contract."

The original agreement of sale between the parties in the instant case in like manner fixed a date for final settlement and contained a clause nearly identical to that found in the cited case. I therefore conclude that time was of the essence as to the contract of sale between the plaintiffs and the defendants in the present case. However, no authority to which the attention of the Court has been directed supports the proposition that a provision making time of the essence may not be altered by subsequent agreement of the parties.

Defendants next argue, however, that any modification of the original agreement which may have occurred was not in writing and is therefore unenforceable as violative of the Statute of Frauds, 6 Del.C. Sec. 2714 (1974). In this context, it is significant that defendant William Crosby conceded at trial that there was an agreement allowing the plaintiffs an extension of undefined duration. Moreover, there is also uncontradicted testimony in the record to the effect that Mr. Crosby assured Mrs. Henderson that there was no necessity that such extension be in writing.

The rule of the majority of courts in the United States is that a defendant may admit the making of an oral agreement within the Statute of Frauds and nonetheless rely on the Statute as a bar to enforcement. See Stevens, Ethics and the Statute of Frauds, 37 Cornell L.Q. 355 (1952) hereinafter cited as Stevens. Indeed, this rule has been acknowledged in Delaware. See *Matthes v. Wier,* 10 Del.Ch. 63, 84 A. 878 (1912).[1] Yet application of this principle in many cases may be productive of problems of considerable magnitude. One writer has expressed the concern that:

"[T]he defendant can admit an honest obligation and yet defeat its enforcement by pleading that the agreement was only oral and that there is no written evidence of the obligation as required by the Statute of Frauds. In the conflict between conscience and judicially approved practice, what is the lawyer to do? Conscience tells him that the practice is wrong, but the literature from insurance companies reminds him of liability for malpractice."

Stevens, supra, at 356.

For more than one hundred years after the creation of the Statute of Frauds there continued to be expressions supporting the principle that the Statute was not intended to be used to defeat performance of an admitted oral agreement.[2] Moreover, the former English rule was also given limited effect by several courts in the United States. For example in *Sealock v. Hackley,* 186 Md. 49, 45 A.2d 744 (1946) the Court stated that:

"His lordship said, the plea insisting on the statute was proper, but then the defendant ought by answer to deny the agreement; for if she confessed the agreement, the Court would decree a performance notwithstanding the statute for that such confession would not be looked upon as perjury, *or intended to be prevented by the statute.*"
*Id.* at 42 (emphasis added by Stevens).

1. "If the defendant admits the parole agreement and does not set up the statute, he is presumed to have waived its protection. If he admits the parole agreement and insists on the benefit of the statute by plea, or in his answer, he will be entitled to it."

2. Stevens, Ethics & Statute of Frauds, 37 Cornell L.Q. 355, 367 (1952). Stevens notes that in the leading early case of *Child v. Godolphin,* I. Dickens 39 (Ch. 1723) it is reported that:

"It is an outstanding fact in this case that the oral agreement was admitted by Sealock in his own testimony. . . . Therefore, the Statute of Frauds does not prevent enforcement of this agreement . . . As stated in *Trossbach v. Trossbach,* 185 Md. 47, 42 A.2d 905, the admissions of a party in the form of testimony constitute sufficient "memoranda" or "writings" under the Statute of Frauds, for recorded testimony is regarded as equivalent to signed depositions. The purpose of the statute of frauds is to protect a party, not from temptation to commit perjury, but from perjured evidence against him."

Id. at 746. See also, *Degheri v. Carobine,* 100 N.J.Eq. 493, 135 A. 518 (1927) [3] and *Zlotziver v. Zlotziver,* 355 Pa. 299, 49 A.2d 779 (1946).

The apparent reason for the change from the old English rule to the modern majority rule was that the former rule supplied the defendant with an inducement to make a perjured denial of an agreement. It was considered more desirable to remove the temptation than to hold a defendant to an agreement admittedly entered into.[4] However, apart from creating obvious ethical problems this approach is in obvious contradiction of the rationale of other recognized exceptions to the Statute.

■ Initially, dissatisfaction with the inequities of such a rule is reflected in the contemporary Statute of Frauds applicable to certain sales of goods appearing in the Uniform Commercial Code and adopted by the Delaware Legislature. See 6 Del.C. Sec. 2–201 (1974). Thus, a contract for the sale of goods which does not satisfy the requirements of a writing but which is valid in other respects is made enforceable if a party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made.

Secondly, the majority rule ignores the policy underlying recognized exceptions to

the statute Stevens reports that in the early history of the statute a defendant was denied the privilege of pleading the statute in three main instances: (a) where his own fraud was responsible for the non-existence of the required signed memorandum; (b) where the equitable doctrine of part performance was applicable, and (c) where the defendant has admitted the contract.

While the majority of the modern decision hold that where a defendant admits the making of an oral contract, the Statute of Frauds may be relied on as a defense to a contract so admitted, even where the admission is by testimony in open court, leading authorities on the subject disagree. See 2 Corbin on Contracts Sec. 320 p. 154 (1950), who criticizes such rule as does Stephens, who at p. 381, supra, says:

"Of the three [exceptions], the most convincing, the one with no attendant risk of perjured proof of a non-existent contract, was the class of cases in which the defendant confessed the contract. It is astonishing, therefore, that this is the only one of the three exceptional instances that has not been universally perpetuated, and it is more astonishing that the removal of the temptation of the defendant to perjure himself by denying the making of an agreement should have been employed as a device for permitting him unethically to escape an honest obligation."

■ Delaware law presently recognizes various exceptions to the Statute. Thus, the Statute will not be a bar to enforcement where sufficient part performance of an unwritten agreement is shown to exist, *Matthes v. Wier,* Del.Ch., supra. The stated reason for recognizing the exception of part performance is that part performance provides the Court with substantial evidence of the existence of a contract. By the same token the same principle should be recognized in a situation such as the one here presented. Accordingly, it is my view that the rule of *Matthes v. Wier,* supra

---

**3.** Rev'd on other grounds, 102 N.J.Eq. 264 140 A. 406 (1928).

**4.** Stevens, supra, at p. 371.

permitting an admission of an agreement and the simultaneous assertion of the Statute of Frauds as a bar to the enforcement of such agreement should no longer be recognized. Because the defendants in the present case have admitted through counsel and during testimony the granting of an extension of time for settlement, they should not, in my opinion, be permitted to interpose the Statute of Frauds as a bar to the plaintiffs' claim.

■ Defendants next argue that the extension agreement lacked mutuality of obligation since the plaintiffs had the right to terminate the original agreement in the event they were unable to obtain the required financing. An extension of time for financial reasons, it is asserted, was merely a recognition of the fact that plaintiffs could not be compelled to settle if they had not made satisfactory arrangements. This argument, in my opinion, lacks merit, the underlying question being whether or not consideration existed for the extension or, whether, on the other hand, plaintiffs' obligation was illusory. Where a contract is executory, the promises of each party supply the consideration necessary to support the contract, *Mobil Oil Corp. v. Wroten,* Del.Ch., 303 A.2d 698, 701, aff'd, 315 A.2d 728 (1973). Here, the extension agreement contained mutual promises consisting of plaintiffs' promise to buy and defendants' promise to sell the land within a reasonable time. In addition, the fact that the agreement contained a financing contingency is not decisive. The agreement by implication bound plaintiffs to a good faith effort to obtain the necessary financing. The agreement thus did not lack mutuality of obligation.

Defendants finally argue that specific performance should be denied because plaintiffs did not seek financing compatible with the contingency provisions of the contract. The contract was contingent on the purchasers obtaining ninety percent financing for a period of twenty years at not more than 8% interest.

■ A consideration of the agreement and the surrounding circumstances compels the conclusion that the financing contingency constituted a condition precedent imposed for the protection and benefit of the plaintiffs. See 77 Am.Jur.2d, Vendor and Purchaser Sec. 366 p. 251 (1975). Indeed, the defendants had no ascertainable interest in the actual terms obtained by the plaintiffs. As such, the condition could be waived by the plaintiffs if they were willing to accept financing on less favorable terms. Since acceptable financing was ultimately obtained, the contingency presents no obstacle to enforcement. Nor does the fact that the plaintiffs sought to finance the Reager and Crosby properties together present a bar to enforcement so long as acceptable financing terms were obtained within the time authorized by the extension agreement.

■ Finally, it is clear that the extension agreement was for an undefined duration. However, where no time for performance is specified in a contract for the sale of real estate a court will imply a reasonable time, *Home Owners Expert Services, Inc. v. Bobb,* Del.Ch., C.A. No. 4815 (December 16, 1976). In the instant case, the written agreement would have expired on May 1, 1973. Plaintiffs were notified on June 5 and again on June 15 that defendants no longer intended to sell the property. It is concluded, in light of the facts of the case, that a delay of approximately one and one-half months was not unreasonable.

First of all, there is uncontradicted testimony in the record that Mr. Eberly conferred with Mr. Crosby on two or three occasions during this period for the purpose of informing him of the progress of the proceedings and the nature of the difficulties being encountered by the plaintiffs. Mr. Crosby was also informed at some time after May 22 that financing had been arranged for and that settlement would take place as soon as all preparations were made and funds received from the lender.[5] In

---

5. Mr. Crosby asserted at trial that he could not remember any specific conversation with Eberly but did not deny or contradict any of Eberly's testimony.

addition, the defendants did not at any time raise an objection to the manner in which the matter was proceeding. Nor did they indicate a desire that settlement take place within a specific time. Indeed, Mr. Crosby openly admitted at trial that he never voiced any complaints of any type to the plaintiffs. One and one-half months was not an unreasonable period of time within which to complete the necessary arrangements, particularly in a situation in which defendants were kept informed of the situation and made no objections or demands of any type.

Since the existence of an agreement to convey the property in question is undisputed and since plaintiffs completed all acts necessary for the performance of their side of the agreement within a reasonable time, specific performance will be ordered as prayed for by plaintiffs.

Order on notice.